# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**WILLIAM Y. BUCHANAN**,

      Petitioner,

v.                                                                                      Civ. No. 03-1231 JP/RHS

**PATRICK SNEDEKER**, Warden, et al.,

      Respondents.

**MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION REGARDING PETITIONER'S REVISED MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONDENTS' MOTION TO DISMISS**

      THIS MATTER comes before the Court on Petitioner Buchanan's Revised Motion for Partial Summary Judgment ("Motion for Partial Summary Judgment"), filed March 18, 2004 **[Doc. No. 13]**. Also before the Court is Respondents' motion to dismiss Claim One on the merits contained in Respondents' Motion to Dismiss for Failure to Exhaust State Remedies or on Grounds of Procedural Default, or to Deny Claim One on the Merits ("Motion to Dismiss"), filed July 20, 2005 **[Doc. No. 34]**.[1] Having considered the parties' submissions, the relevant authorities, and being otherwise fully advised in the premises, the Court finds that Petitioner's Motion for Partial Summary Judgment is well-taken and recommends that it be granted. The Court further finds that Respondents' Motion to Dismiss is moot and recommends that it be denied.

---

[1] On June 6, 2006, this Court denied Respondents' motion to dismiss Claim One based on lack of exhaustion or procedural default. (Memorandum Opinion and Order Overruling Respondents' Objections and Adopting Magistrate Judge's Proposed Findings and Recommended Disposition **[Doc. No. 48]**).

## Procedural Background

The State of New Mexico tried Petitioner William Y. Buchanan on charges of First Degree Murder (Felony Murder), Conspiracy to Commit First Degree Murder, False Imprisonment, Conspiracy to Commit False Imprisonment, and Accessory to Aggravated Battery. After a Grant County jury convicted Petitioner on these charges, judgment was entered on December 29, 1998 and Petitioner received a sentence of life in prison plus twenty-one years. (See First Amended Judgment, Sentence and Commitment, Ex. B attached to Answer, filed Dec. 1, 2003 **[Doc. No. 6]**[2]). Petitioner attacked his convictions on direct appeal to the New Mexico Supreme Court, which affirmed the convictions on January 16, 2002. (See Decision, Ex. O).

On January 14, 2003, Petitioner applied for a writ of habeas corpus pursuant to N.M.R.A. 5-802 in the Sixth Judicial District of New Mexico; that application was summarily dismissed on March 19, 2003. (See Application for a Writ of Habeas Corpus Pursuant to N.M.R.A. 5-802, Ex. T; Summary Dismissal of Application for Writ of Habeas Corpus, Ex. U[3]). The New Mexico Supreme Court denied Petitioner's writ of certiorari on August 6, 2003. (See Order, Ex. Z). On October 24, 2003, Petitioner filed an application for a writ of habeas corpus in this Court, alleging five claims of error. (See Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 By a Person in State Custody ("Petition") **[Doc. No. 1]**).

---

[2]All exhibits, unless otherwise indicated, are attached to Respondents' Answer **[Doc. No. 6]**.

[3](See also Notice of Filing of Complete Exhibit U to Answer, filed July 18, 2005 **[Doc. No. 33]**).

In the instant motion, Petitioner moves for summary judgment only with respect to Claim One of his Petition.[4]  In their response to Petitioner's motion, Respondents challenged one of the material facts presented in Petitioner's motion, but did not dispute any other material facts or present legal argument in opposition to Petitioner's Motion for Partial Summary Judgment.  (See Respondent's Memorandum in Opposition to Motion for Partial Summary Judgment, filed May 7, 2004 **[Doc. No. 15]**).  On September 29, 2004, I concluded that material facts were in dispute and recommended that Petitioner's Motion for Partial Summary Judgment be denied on that basis.  (See Magistrate Judge's Proposed Findings and Recommended Disposition **[Doc. No. 19]**).  However, in response to an order for supplemental briefing, Respondents acknowledged that the material fact at issue was no longer in dispute.  (See Order Setting Supplemental Briefing Schedule, filed Jan. 21, 2005 **[Doc. No. 21]**; Respondent's Supplemental Response Regarding Petitioner's Material Fact # 3, filed Feb. 11, 2005 **[Doc. No. 23]**).[5]

On July 24, 2005, the Court ordered supplemental briefing regarding the impact of the Supreme Court's decision in Lilly v. Virginia, 527 U.S. 116 (1999) on the admissibility of hearsay evidence and whether, assuming a violation of Petitioner's rights under the Confrontation Clause of the Sixth Amendment, such a violation constituted "harmless error."  (Order Setting

---

[4]In Claim One, Petitioner contends that the admission of a non-testifying co-defendant's out-of-court statement to law enforcement officials violated his Sixth Amendment right to confront the witnesses against him.  (See Memorandum in Support of Motion for Partial Summary Judgment at 1 **[Doc. No. 14]**).

[5]Respondents' motion for leave to file a surreply to Petitioner's Motion for Partial Summary Judgment was denied on March 10, 2005.  (See Order Denying Leave to File a Surreply **[Doc. No. 27]**).

Supplemental Briefing Schedule **[Doc. No. 29]**).  By August 12, 2005, the parties had submitted their supplemental briefs.  (See **[Doc. Nos. 31, 32, 36, 41]**).

Following review and consideration of the parties' submissions, the relevant authorities, and being otherwise fully advised in the premises, the Court recommends that Petitioner's Motion for Partial Summary Judgment be granted with respect to Petitioner's Claim One because:  (1) no genuine issue of material fact exists, and (2) Petitioner is entitled to judgment as a matter of law.  The Court recommends that Respondents' Motion to Dismiss be denied as moot.

**Standards of Review**

*1.  Summary Judgment*

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment.  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact.  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant.  Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings.  Bachhus, 939 F.2d at 891.  To withstand a motion for summary judgment, the non-movant must make specific reference to admissible

evidence in the record. Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1546 (10th Cir. 1995). Unsubstantiated allegations, no matter how true they might be, cannot be considered. Id.

    *2. Habeas Corpus Relief*

In order for a federal court to grant relief to a petitioner in state custody seeking a writ of habeas corpus based on legal error, the state adjudication must have "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In Bell v. Cone, 535 U.S. 685, 694 (2002), the United States Supreme Court wrote, "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." A writ may be issued under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." Bell, 535 U.S. at 694.

### Undisputed Factual Background

The following facts are not in dispute. During the investigation of drug trafficking and the disappearance of Darrett McCauley ("Victim"), Federal Bureau of Investigation ("FBI") Agents Tom Coldbridge and Jeffrey Pittman attempted to contact Richard "Eddie" Sanders, who would later become Petitioner's co-defendant. The Agents first contacted Sanders through his father. The Agents told Sanders' father that they were investigating Sanders, that there was a threat of violence against Sanders, and that they would like to talk to Sanders. The Agents left a telephone number with Sanders' father where Sanders could reach the Agents. The next day, Sanders

responded by calling the Agents and leaving a cell phone number where he could be reached. On July 28, 1994, Agent Pittman called Sanders and the following telephone conversation occurred:

| | |
|---|---|
| Sanders: | Okay, would it help you all in the investigation if I cooperated at all? |
| Pittman: | It's . . . it certainly would and . . . may in fact help yourself. |
| Sanders: | Well, I'm ready. |
| Pittman: | Okay, you need to understand that I can't promise you anything. |
| Sanders: | Yeah, I realize that. |
| Pittman: | But what I can do is I can . . . um . . . communicate to the U.S. Attorney with whom I work on a daily basis about your cooperation. |
| Sanders: | Okay. |

During meetings with the Agents in July and August of 1994,[6] Sanders implicated Petitioner and co-defendant Kenny Hill in the following account, retold by Agent Colbridge at trial:

> [Petitioner], along with Richard Sanders and Kenny Hill, was in the illegal drug business. Hill believed the victim, Darrett McCauley, who also apparently sold illegal drugs, had stolen some money from him. Hill discussed this with [Petitioner], and, thereafter, the victim was summoned to Deming. At [Petitioner's] home, the victim was beaten, stabbed, and pepper sprayed. After two days at [Petitioner's] home, the victim was forced into a toolbox mounted in the rear of [Petitioner's] pick-up truck. According to Sanders, [Petitioner] ordered him and Hill to drive the victim until they received instructions from [Petitioner] on where to deliver their captive to a person or persons who apparently wanted to kill him. Sanders and Hill were unable to locate such a person or persons, because they failed to hear back from [Petitioner] regarding the delivery location. Sanders and Hill ultimately drove to a remote area near Reserve, where they shot and killed the victim.

(Memo at 4 ¶12). Sanders did not commit this account to a signed writing. Sanders later challenged the voluntariness of his statements to the Agents. (See Memo at 6 ¶15).

**Discussion**

---

[6]The Agents gave Sanders <u>Miranda</u> warnings on several occasions. (See Memorandum in Support of Motion for Partial Summary Judgment at ("Memo") 4 ¶11, filed Mar. 18, 2004 **[Doc. No. 14]**).

Because no disputed issues of material fact exist, the issue before the Court is whether Petitioner is entitled to judgment as a matter of law in light of Sixth Amendment Confrontation Clause and habeas corpus precedence. I conclude that he is so entitled. "In all criminal prosecutions, state as well as federal, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, 'to be confronted with the witnesses against him.' U.S. Const., Amdt. 6; Pointer v. Texas, 380 U.S. 400 (1965) (applying Sixth Amendment to the States)."[7] Lilly, 527 U.S. at 123 (plurality). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Id. 527 U.S. at 123-24 (citing Maryland v. Craig, 497 U.S. 836, 845 (1990)) (internal quotation marks omitted).

The New Mexico Supreme Court ("NMSC") devoted approximately two pages to discussing the issue of whether Petitioner's Confrontation Clause right was violated and unanimously found that it was not. (Decision at 7-8, Ex. O). The NMSC explained that "[i]n State v. Gonzales, 1999-NMSC-033, ¶35, 128 N.M. 44, 989 P.2d 419, we applied a two-pronged test for determining whether the State had satisfied the burden imposed by the United States Supreme Court in Ohio v. Roberts, 448 U.S. 56, 65 (1980)" to evaluate whether challenged hearsay evidence possessed adequate indicia of reliability.[8] (Decision at 7, Ex. O). The NMSC

---

[7]For example, before considering and accepting a defendant's plea of guilty "the court must inform the defendant of, and determine that the defendant understands [*inter alia*] . . . . the right at trial to confront and cross-examine adverse witnesses . . . ." Fed. R. Crim. P. 11(b)(E).

[8]The NMSC described the test as a determination of whether the evidence: (1) "falls within a firmly rooted hearsay exception or (2) . . . contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the

further explained that the factors it uses "to determine the particularized guarantees of trustworthiness of a hearsay confession of a co-defendant are 'subsumed within' those to be used in evaluating whether such a declarant's statement satisfies [New Mexico] Rule 11-804(B)(3)[9] . . . ." (Decision at 7-8 (citing <u>Gonzales</u>, 1999-NMSC-033, ¶¶ 38, 39 (other citation omitted) Ex. O).

The NMSC concluded that because co-defendant Sanders was "unavailable to testify" and because "Sanders' statements to the FBI were clearly against his penal interest[,]" Petitioner has "failed to show that the admission of the co-defendant's confession was an abuse of discretion." (Decision at 8, Ex. O). The NMSC apparently reached this conclusion based on an exception to the hearsay rule provided under NMRA 11-804(B)(3). However, the NMSC did not explicitly state that such an exception constitutes a "firmly rooted" hearsay exception under New Mexico state law or federal Confrontation Clause law.[10] The NMSC next "turn[ed] to the examination of the trustworthiness of Sanders' statements." (Decision at 8, Ex. O). In concluding that Sanders' statements were trustworthy, the NMSC considered several factors, including the voluntariness of Sanders' confession.

---

statements' reliability." (Decision at 7 (citations and internal quotation marks omitted) Ex. O).

[9] New Mexico Rule 11-804(B)(3) addresses hearsay evidence in situations where an unavailable declarant has made a statement against the declarant's interest. The rule provides that a "statement against interest" is a "statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." <u>Id.</u>.

[10] Even assuming that Sanders' statements "were against his penal interest as a matter of state law, . . . the question whether the statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law." <u>Lilly</u>, 527 U.S. at 125.

In his Motion for Partial Summary Judgment, Petitioner argues that the New Mexico Supreme Court decision is both "contrary to" and an "unreasonable application" of clearly established federal law. Specifically, Petitioner argues that in light of the United States Supreme Court decisions in Lilly and Lee, the NMSC's reliance on the voluntariness of Sanders' statements "was both contrary to and an unreasonable application of clearly established Supreme Court law." (Memorandum in Support of Petitioner's Revised Motion for Partial Summary Judgment at 19-20, filed Mar. 18, 2004 **[Doc. No. 14]**). This Court agrees that the NMSC's consideration of the voluntariness of Sanders' statements in determining their reliability or trustworthiness for Confrontation Clause purposes was contrary to clearly established federal law. See Brown v. Uphoff, 381 F.3d 1219, 1225 (10th Cir. 2004) (explaining that the United States Supreme Court unequivocally has held that a court's reliance on voluntariness is "inappropriate for determining whether a statement is trustworthy") (citing Lee, 476 U.S. at 544). Moreover, this Court notes that the NMSC also improperly relied on two additional factors in determining that Sanders' statements were reliable and trustworthy for Confrontation Clause purposes, that is: (1) whether Sanders received promises of leniency,[11] and (2) whether Sanders' statements were against his penal interest.[12] See Brown, 381 F.3d at 1228 n.6 (noting that in Lilly, "a plurality of the

---

[11] See Lilly, 527 U.S. at 139 (explaining that "the absence of an express promise of leniency to [the declarant] does not enhance his statements' reliability to the level necessary for their untested admission[,]" noting that "police need not tell a person who is in custody that his statements may gain him leniency in order for the suspect to surmise that speaking up, and particularly placing blame on his cohorts, may inure to his advantage").

[12] See Lilly, 527 U.S. at 138-39 (rejecting a state court's "proffered basis for reliability – that [the declarant] knew he was exposing himself to criminal liability . . . . [because] such statements are suspect insofar as they inculpate other persons") (plurality); see e.g., Gomez, 191 F.3d at 1223 (observing that "after the Supreme Court's decision in Lilly, it is no longer clear whether considering the degree to which a statement is against penal interest is even

Supreme Court expressly concluded that the absence of an offer of leniency and the presence of some statements against penal interest were not relevant indicia of reliability which would support the admission of a co-defendant's confession under the Roberts test . . . . [and that] Lilly announced a new rule with respect to the consideration of the[se] [factors]"). In "relying on these factors, the [NMSC] arrived at a conclusion 'diametrically different' from Supreme Court precedent." Brown, 381 F.3d at 1225 (citing Williams v. Taylor, 529 U.S. 362, 406 (2000). Accordingly, this Court finds that the NMSC acted contrary to clearly established federal law in relying on one or more improper factors to assess the trustworthiness of Sanders' statements.

"Because the [NMSC]'s reasoning was contrary to clearly established law, AEDPA deference does not apply . . . . [and this Court] must determine *de novo* if a violation of the Confrontation Clause occurred." Brown, 381 F.3d at 1225 (emphasis added) (citing Spears v. Mullin, 343 F.3d 1215, 1248 (10th Cir. 2003)). Under pre-AEDPA precedent, this Court "presume[s] the factual findings of the 'state court . . . are correct unless clearly erroneous.'" Brown, 381 F.3d at 1227 (emphasis added) (quoting Crespin v. State of New Mexico, 144 F.3d 641, 647 (10th Cir. 1998)). However, the ultimate "determination concerning the reliability of the statement[s] is a mixed question of law and fact reviewed *de novo*." Id. (citing Crespin, 144 F.3d at 647) (emphasis added).

*I. Whether Sanders' statements fall within a firmly rooted hearsay exception*

As previously stated, the NMSC did not explicitly find that Sanders' statements fell within a firmly rooted hearsay exception under either state or federal law. In Lilly, the United States Supreme Court declared: "The decisive fact, which we make explicit today, is that accomplices'

---

permissible").

confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." Id. at 134 (plurality). The Tenth Circuit noted that in Lilly, "the Supreme Court explicitly considered the use of statements against penal interest offered by the prosecution in the absence of the declarant to incriminate a criminal codefendant . . . . [and] [f]ive members of the Court held that such statements do not categorically satisfy Confrontation Clause concerns." United States v. Gomez, 191 F.3d 1214, 1221 (10th Cir. 1999) (citing Lilly, 119 S.Ct. 1887, 1899, 1903 (1999));[13] see also Murillo v. Frank, 402 F.3d 786, 791 (7th Cir. 2005) (referring to Justice Stevens' opinion as that of "the Court," because in light of the positions taken by Justices Scalia and Thomas, "the plurality opinion [in Lilly] . . . was the most narrow ground of decision and hence constitutes the holding") (citing Marks v. United States, 430 U.S. 188, 193 (1977)).

In Lee v. Illinois, 476 U.S. 530 (1986), the Supreme Court noted that since 1965 "the Court has spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants." Id. 476 U.S. at 541; see also Lilly, 527 U.S. at 133 (plurality) (noting "that our cases consistently have viewed an accomplice's statements that shift or spread blame to a criminal defendant as falling outside the realm of those 'hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability'") (citing White, 502 U.S. at 357, 112 S.Ct. 736). In light of these principles, the Court concludes that Sanders' statements against his penal interest, at least to the extent that they

---

[13]But see Beem v. McKune, 48 Fed.Appx. 281, 283 (10th Cir. Sep. 5, 2002) (not selected for publication in the Federal Reporter) ("The only real consensus in Lilly was that there was a Confrontation Clause violation where the statements were not against the declarant's penal interest because the declarant did not admit his own liability.")

inculpate Petitioner, do not fall within a firmly rooted hearsay exception under the first prong of the Roberts test.

*II. Whether Sanders' statements contain particularized guarantees of trustworthiness*

The NMSC apparently found that Sanders' statements satisfied the second prong under Roberts, in that his statements contained particularized guarantees of trustworthiness.[14] The NMSC relied on the following factors in reaching its conclusion that Sanders' statements contained sufficient indicia of reliability: (1) the "voluntariness of co-defendant Sanders' confession,"[15] (2) Sanders had not been charged with a crime and was "neither in custody nor under government supervision at the time he made the statements to the FBI," (3) "Sanders received no promises of leniency in exchange for his statements," (4) Petitioner was apparently already aware of a credible threat of violence communicated to him by the FBI, (5) "it was Sanders who chose to call the FBI, meet with the agents, and eventually confess to the murder," (6) the NMSC's conclusion, based on "the circumstances as a whole, [that] there is no indication Sanders was attempting to curry favor with authorities," (7) a finding that "it was clearly against Sanders' penal interest to declare his role in planning and committing first degree deliberate

---

[14]The NMSC found that these factors were subsumed within N.M. Rule 11-804(B)(3), which addresses hearsay evidence in situations where an unavailable declarant has made a statement against the declarant's interest. (See n.9, supra).

[15]Specifically, the NMSC noted that "the voluntariness of co-defendant Sanders' confession has previously been addressed by this Court in State v. Sanders, 2000-NMSC-032, ¶22." (Decision at 8, Ex. O). However, in Sanders, the NMSC addressed the voluntariness of Sanders' confession with respect to its admission as evidence against *Sanders*, not Petitioner. "When dealing with admissions against penal interest, we have taken great care to separate using admissions against the declarant . . . from using them against other criminal defendants." Lilly, 527 U.S. at 127.

murder . . . [and other crimes]," and (8) the NMSC's conclusion that "Sanders did not shift blame for first degree murder away from himself." (Decision at 8, Ex. O).

The United States Supreme Court noted that it has "over the years spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants." Lilly, 527 U.S. at 131 (citations and internal quotation marks omitted).[16] Although "the presumption of unreliability that attaches to codefendants' confessions . . . may be rebutted, Lee, 476 U.S. at 543, 106 S.Ct. 2056, the more recent Lilly plurality cautions us that it is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice – that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." Gomez, 191 F.3d at 1222 (citing Lilly, 119 S.Ct. at 1900). In light of the heavy weight of this presumption, this Court has considered the circumstances surrounding Sanders' statements and concludes that they do not exhibit sufficient indicia of reliability to overcome their presumptive unreliability.

In light of Lilly and Lee, this Court is precluded from considering the voluntariness of Sanders' statements as a factor indicating reliability. Nor may I presume that the absence of promises of leniency or the presence of some statements against Sanders' penal interest are relevant indicia of reliability. See Brown, 381 F.3d at 1228 n.6 ("Assuming that Justice Scalia's separate concurrence should be counted as a fifth vote against consideration of the[se] two

---

[16]While the NMSC referenced Lilly in a citation, it did not mention or discuss the effect of this presumption in examining the reliability of Sanders' statements.

13

factors . . ., Lilly would affect our application of Earnest[17] to this case.").[18]  However, the NMSC considered additional factors in determining whether Sanders' statements contained sufficient indicia of reliability.

The NMSC noted that Sanders had "not been charged with any crime," and was "neither in custody nor under government supervision" when he made his statements to the FBI. (Decision at 8, Ex. O).  While the undersigned finds that this fact generally cuts in favor of reliability, its significance is diminished given that Sanders knew he was under criminal investigation when he spoke with the Agents.  (Motion Tape #1, 4/21/98.)  Accordingly, whether Sanders had been formally detained or arrested did not alter the basis for the presumptive unreliability of his statements to the FBI.  That is, at the time Sanders made his statements, he had a natural incentive or motive to minimize his actions, inculpate others, shift or spread blame or curry favor with the authorities.[19]  Under these circumstances, the fact that Sanders had not been formally arrested or taken into custody carries relatively little weight regarding the reliability of his statements.

The NMSC acknowledged that the FBI Agents communicated a credible threat of violence to Sanders, but assigned little weight to this fact because "apparently, Sanders was already aware of the threat."  (Decision, Ex. O).  The FBI Agents' communication of a threat to Sanders, followed shortly thereafter by Sanders' confession, generally cuts against a finding of

---

[17]Earnest v. Dorsey, 87 F.3d 1123 (10th Cir. 1996).

[18]As previously noted, at least one United States Circuit Court of Appeals has found that the plurality opinion in Lilly constitutes its holding.  Murillo, 402 F.3d at 791.

[19]In addition, as discussed below, other factors militated against the reliability of Sanders' statements.

14

reliability.[20]  While the NMSC's finding might support its conclusion that Sanders' statements were voluntary, a finding of voluntariness is not a relevant indicia of reliability under the Roberts test.  Moreover, the NMSC did not explain why, despite Sanders' prior awareness, he made his statements to the FBI only after receiving notice of the threat from the Agents.  This factor weighs against a finding of reliability.

The NMSC's finding that "it was Sanders who chose to call the FBI, meet with the agents, and eventually confess to the murder" (Decision at 8, Ex. O (citing Sanders, 2000-NMSC-032, ¶ 21)) entirely ignores the fact that the FBI initiated contact with Sanders by visiting Sanders' father, informing Sanders' father of the investigation and threat of violence against his son and providing a telephone number for Sanders to call.  Sanders did not choose to call the FBI until after learning of the FBI's attempt to contact him.  Moreover, the NMSC apparently relied on this finding as support for the irrelevant conclusion that Sanders' statements were voluntary.[21]  Thus, this finding presents incomplete information and does not support a determination that Sanders' statements were reliable.

---

[20]Sanders argued on direct appeal that "the threat on his life induced his confession." Sanders, 2000-NMSC-032, ¶ 11, 13 P.3d at 465.  The circumstances surrounding Sanders' statements to the FBI suggest a potential motive on Sanders' part to seek protection, shift or spread blame, avenge himself and/or divert attention to others.  See e.g., id. ¶ 2, 13 P.3d at 462 (Sanders informing the Agents "to go ahead and keep track of me . . . . [because] I have a sneaking suspicion about how [the investigation] originated"); (Motion Tape No. 3, 4/21/98 (Agent Colbridge testifying that Sanders mentioned that he felt threatened, "cut out of the organization" or "left out to dry" following the death of Victim)).

[21]In making this finding, the NMSC cited to its decision in Sanders, which involved a challenge to the voluntariness and admission of Sanders' statements against Sanders, rather than Petitioner.

In noting that Sanders received no promise of leniency, the NMSC also found that Sanders "was told *only* that the U.S. Attorney would be informed of his cooperation." (Decision at 8, Ex. O (emphasis added)). However, this finding is not entirely correct and cuts against a determination that Sanders' statements are reliable. While Agent Pittman told Sanders that he could not promise him anything, he also informed Sanders that his cooperation "may in fact help yourself." Sanders, 2000-NMSC-032, ¶2, 13 P.3d at 462. This Court finds that the suggestion to Sanders that he might help himself by cooperating with the FBI, coupled with the Agent's offer to inform the U.S. Attorney of Sanders' cooperation, weighs heavily against a finding of reliability. See e.g., Gomez, 191 F.3d at 1223 (explaining that the fact that "the detaining officer told both codefendants their cooperation would be beneficial . . . . militate[d] against a finding of reliability"). Based on Sanders' knowledge that the FBI was conducting a criminal investigation and the FBI Agent's response to Sanders' question regarding cooperation, Sanders could easily have envisioned a potential benefit in cooperating with the FBI, particularly if he implicated others and minimized his own role in any criminal conduct.[22] See Lilly, 527 U.S. at 132 (citing Lee, 476 U.S. at 541) (reiterating "the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross-examination") & id. at 139 (noting that "police need not tell a person who is in custody that his statements may

---

[22]Sanders claimed on direct appeal that Agent Pittman's "promise to inform the United States Attorney about his cooperation with the FBI investigation was sufficient to induce his confession." Sanders, 2000-NMSC-032, ¶10, 13 P.3d at 464. While the Tenth Circuit discounted a declarant's similar claim in Brown, noting that the declarant "had already provided a substantial amount of information . . . [about the crime] *prior* to that comment by investigators[,]" here, Sanders provided virtually no information about the crimes prior to Agent Pittman's similar comments. Id. 381 F.3d at 1228 n.7 (emphasis added).

gain him leniency in order for the suspect to surmise that speaking up, and particularly placing blame on his cohorts, may inure to his advantage").

Given the facts and circumstances surrounding Sanders' statements to the Agents, particularly Sanders' expressed interest in cooperation, this Court respectfully disagrees with the NMSC's conclusion that "there is *no* indication Sanders was attempting to curry favor with authorities." (Decision at 8, Ex. O (emphasis added)). Nevertheless, even assuming the accuracy of this conclusion does not mean that Sanders otherwise lacked a motive or incentive to minimize his conduct, inculpate others, avenge himself or otherwise divert attention from himself.[23]

The NMSC noted that "it was clearly against Sanders' penal interest to declare his role in planning and committing first degree deliberate murder, false imprisonment, and conspiracy." (Decision at 8, Ex. O). However, the Tenth Circuit noted in Gomez, that "after . . . Lilly, it is no longer clear whether considering the degree to which a statement is against penal interest is even permissible." 191 F.3d at 1223. Moreover, "such statements [against penal interest] are suspect insofar as they inculpate other persons." Lilly, 527 U.S. at 139. Accordingly, the portions of Sanders' statements that inculpate himself do not necessarily make reliable those portions that inculpate others.

---

[23]In considering Sanders' challenge to the voluntariness of his statements on direct appeal, the NMSC found that "[i]t is impossible for this Court to fully understand what convinced Sanders to cooperate with the FBI . . . [although] we do not believe that the officers coerced Sanders' confession." Sanders, 13 P.3d at 467. The NMSC concluded "that Sanders was [apparently] motivated to cooperate for reasons that had nothing to do with any improper police conduct." Id. at 467. The NMSC's admission that it could neither fully understand Sanders' motivation nor pinpoint his reasons for cooperating with the FBI raises further doubt that Sanders' "truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." Idaho v. Wright, 497 U.S. 805, 820 (quoted in Lilly, 527 U.S. at 136).

17

The NMSC also found that "Sanders['] [statements] did not shift the blame for first degree murder away from himself." (Decision at 8, Ex. O).  Petitioner challenges the accuracy of this finding, contending that the record shows that "Sanders attributed virtually every significant act in the battery and murder of [Victim] McCauley either to Hill or to [Petitioner]."  (Memo at 25).  This Court is inclined to agree with Petitioner's assertion that Sanders' statements, while inculpating himself, also attempted to shift blame to others.[24]  However, even assuming that the NMSC did not err in finding that Sanders' statements did not *shift* blame, the failure to find that Sanders' statements "*spread* blame" was clear error.  Gomez, 191 F.3d at 1223 (emphasis added) (indicating that a presumption of unreliability attaches to codefendant confessions "that shift or spread blame").  Here, the record conclusively shows that, at a minimum, Sanders' statements to the FBI spread the blame for Victim's death.  According to Sanders' version of events, Petitioner appeared to act as a "mastermind," repeatedly "ordering" Sanders and others to carry out various activities, whereas Hill acted as the "triggerman" in Victim's death.  Thus, while Sanders' statements inculpated himself, they "spread blame equally at best."  Gomez, 191 F.3d at 1223.  A finding that Sanders' statements spread blame to others weighs against a finding of reliability.

---

[24]For example, Sanders claimed, *inter alia*, that Petitioner ordered Sanders to wire money to Victim, that Petitioner and Hill ordered Sanders to stay with Victim, that Petitioner ordered Sanders to search Victim's vehicle, that Petitioner and Hill beat and stabbed Victim at Petitioner's house, that Petitioner shoved Victim into a bathroom and pepper-sprayed Victim, that Petitioner ordered Sanders to guard Victim in a shed at Petitioner's house, that Petitioner, Hill and Sanders agreed that Victim should be taken to a Mexican family that intended to kill Victim, that Petitioner ordered Sanders and Hill to drive around with Victim until Petitioner contacted them, that Sanders and Hill eventually decided they would have to kill Victim themselves, that Hill shot Victim, and that Petitioner and Sanders agreed that Petitioner would dispose of the gun used to kill Victim.  (See Memo at 17-18 (citing Jury Trial Tape Nos. 23, 24, 26, 27, 36, 40)).

Finally, Petitioner points to another factor weighing against a finding of reliability, in that "Sanders never memorialized those statements in a signed writing (nor did the agents tape record or videotape [Sanders'] statement. Instead, Agent Colbridge created memoranda purportedly reflecting the substance of [Sanders'] statements." (Memo at 18 (citing Motions Tape Nos. 2 & 3, 4/21/98)). Under these circumstances, it is impossible to ascertain how the interviews were conducted or know the exact questions and responses that passed between the Agents and Sanders. See e.g., Murillo v. Frank, 316 F.Supp.2d 744, 756 (E.D. Wis. Apr. 6, 2004), aff'd by, 402 F.3d 786 (7th Cir. 2005) (noting that while a recorded statement provides an "opportunity to evaluate the [declarant's] actual statements," the introduction of only a declarant's signed affidavit "more closely resembles the very procedure that a clear majority of the Supreme Court has now concluded the Sixth Amendment was most intended to outlaw"[25]). In this case, Sanders' statements were neither recorded nor preserved in an affidavit; they were summarized by, and presented through the testimony of, FBI Agents. This Court concludes that this factor cuts against a finding of reliability.

### Conclusion and Recommendation

This Court concludes that Sanders' statements are presumptively unreliable and were given under all of the conditions "that implicate the core concerns of the old ex parte affidavit practice," that is: (1) The government (i.e., FBI Agents Colbridge and Pittman) was involved in the production of Sanders' statements as described above, (2) Sanders' statements described past events, and (3) Sanders' statements were not subjected to adversarial testing. Lilly, 527 U.S. at

---

[25]Citing Crawford v. Washington, 541 U.S. 36, --- (2004) and White v. Illinois, 502 U.S. 346, 363 (1992).

137.  Having considered the relevant factors in accordance with clearly established federal law, the undersigned finds that the heavy presumption of unreliability attached to Sanders' statements has not been rebutted.  Thus, the admission of co-defendant Sanders' statements at trial without affording Petitioner the opportunity to confront and cross-examine him fundamentally violated Petitioner's Confrontation Clause right under the Sixth Amendment to the United States Constitution.

The NMSC's decision that Petitioner's Sixth Amendment right under the Confrontation Clause was not violated was contrary to, or involved an unreasonable application of, clearly established Federal law.  This Court recommends that Petitioner's Revised Motion for Partial Summary Judgment **[Doc. No. 13]** be **granted** with respect to Claim One of Petitioner's application for a writ of habeas corpus.  The Court further finds that any issues raised in the Motion to Dismiss that were not previously resolved by this Court have been addressed in these proposed findings and recommended disposition.  Accordingly, this Court recommends that the Motion to Dismiss **[Doc. No. 34]** be **denied** as moot.

Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations.  A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_Robert Hayes Scott_
ROBERT HAYES SCOTT
UNITED STATES MAGISTRATE JUDGE